Donald M. PARADIS, Petitioner–
Appellant,

v.

A.J. ARAVE, Warden, Idaho State
Penitentiary, Respondent–
Appellee.

No. 96–35670.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 25, 1997.

Decided Nov. 20, 1997.

Edwin S. Matthews, Jr., Coudert Brothers, New York, New York, and William L. Mauk, Mauk & Smith, Boise, Idaho, for petitioner-appellant.

Lynn E. Thomas, Solicitor General, Boise, Idaho, for respondent-appellee.

Before: CANBY and TASHIMA, Circuit Judges, and SILVER,* District Judge.

TASHIMA, Circuit Judge:

## I. OVERVIEW

Donald M. Paradis was convicted of the murder of Kimberly Palmer in Idaho and sentenced to death. In November 1995, before his second petition for post-conviction relief in the Idaho state courts had been decided, Paradis filed his second petition for habeas corpus relief in federal district court. In January 1996, Paradis discovered new evidence. His motion to augment the record and for leave to file a supplemental brief before the Idaho Supreme Court was denied. In May 1996, the Governor of Idaho commut-ed Paradis' sentence of death to life imprisonment without the possibility of parole. The federal district court dismissed Paradis' amended second petition (the "second petition"). We now affirm in part, reverse in part, and remand.

## II. FACTUAL BACKGROUND

The underlying facts are portrayed in detail in *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 ( 1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984) (*"Paradis I"*), and *Paradis v. Arave*, 667 F.Supp. 1361 (D.Idaho 1987) (*"Paradis II"*), *aff'd in part and rev'd in part*, 954 F.2d 1483 (9th Cir.1992) (*"Paradis III"*), *vacated and remanded*, 507 U.S. 1026, 113 S.Ct. 1837, 123 L.Ed.2d 463 (1993), *aff'd on remand*, 20 F.3d 950 (9th Cir.1994), *cert. denied*, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995).

On June 19, 1980, Kimberly Palmer ("Palmer") and Scott Currier ("Currier") departed from Palmer's Spokane, Washington, residence for a camping trip to Idaho in a blue and white Volkswagen van. At around 12:45 a.m. on June 21, Currier and Palmer checked into the Paul Bunyan Motel in Spokane, around the corner from Paradis' residence, but checked out shortly afterwards.

About 6:30 a.m., on June 21, Ruth Jones witnessed a blue and white Volkswagen van with two or three men ascending Mellick Road, a steep mountain road in Post Falls, Idaho. Thirty minutes later, she saw three men coming from the area of Mellick Road by foot. During the next 30 minutes, the three men were repeatedly observed in Post Falls. They were identified as Paradis, Thomas Gibson and Laurence Evans.

In the morning of June 22, a one-car rollover was reported to the Post Falls police, who discovered the blue and white van surrounded by various of its former contents. Palmer's body was found 70 to 80 feet from the van, lying face down, slightly immersed in a creek, and dressed only in a pair of unzipped jeans. Currier's body was later

---

* The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

discovered in the brush near the van, stuffed in a sleeping bag.

## III. PROCEDURAL HISTORY

Paradis was convicted of the first-degree murder of Palmer in Idaho state court in Kootenai County and sentenced to death.[1] His conviction and death sentence were affirmed on automatic appeal by the Idaho Supreme Court. *Paradis I*, 106 Idaho 117, 676 P.2d 31.

Paradis' first petition for state post-conviction relief was denied. *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986). He then brought a federal habeas petition, pursuant 28 U.S.C. § 2254, in which relief was denied. *Paradis II*, 667 F.Supp. 1361. The claims in his first federal petition, except for those rendered moot by the commutation of his death sentence, were: (1) failure to preserve and disclose exculpatory evidence by permitting the cremation of Palmer's body and losing items from Paradis' Spokane residence; (2) insufficiency of the medical evidence to support the theory of Palmer's death in Idaho, which gave jurisdiction to Idaho; (3) insufficient circumstantial, non-medical evidence to find Paradis guilty beyond a reasonable doubt of Palmer's murder; (4) double jeopardy and violation of due process for permitting evidence of Currier's death; (5) ineffective assistance of counsel; (6) prosecutorial misconduct; and (7) improper venue. All claims were denied on their merits, except for the last two which were procedurally defaulted.

On June 27, 1989, Paradis filed a second petition for state post-conviction relief, alleging that: (1) counsel assisted him ineffectively due to a conflict of interest; and (2) newly-discovered evidence establishes that Palmer was not killed in Idaho. On August 25, 1994, the state district court dismissed the second petition as meritless and Paradis appealed. After he received the previously-undisclosed documents generated by the Kootenai Coun-

ty prosecutor, Paradis moved, on January 17, 1996, to augment the record and for leave to amend the briefs, pursuant to Idaho Appellate Rule 44. The motion was denied. The dismissal of Paradis' second state petition was affirmed on February 27, 1996, for want of timeliness under Idaho Code § 19–2719.[2] *Paradis v. State*, 128 Idaho 223, 912 P.2d 110 (1996).

On May 17, 1996, the Clemency Commission of the State of Idaho recommended that Paradis be granted clemency and the Governor of Idaho commuted Paradis' death sentence to life imprisonment without the possibility of parole.

Meanwhile, on November 14, 1995, Paradis had filed his second federal petition for habeas relief. On January 16, 1996, he filed a motion to conduct discovery with respect to the previously-undisclosed documents, which was subsequently renewed with a motion for leave to amend the petition. On April 1, 1996, the motion to conduct discovery was denied and the motion for leave to amend the second petition was granted. As amended, the second petition alleged that: (1) counsel suffered from a conflict of interest; (2) the medical evidence shows that Palmer was not murdered in Idaho; (3) newly-available witnesses contradict the theory that Palmer was murdered in Idaho; and (4) the prosecution failed to disclose to the defense exculpatory evidence in its possession (the *"Brady claims"*).

The district court dismissed the second petition as successive or abusive. Paradis timely appeals and the district court issued a certificate of probable cause authorizing this appeal.

## IV. DISCUSSION

### A.

### 1.

We have jurisdiction to review a dismissal of a petition for a writ of habeas corpus

---

1. At separate trials, Gibson was convicted of Palmer's murder and Evans was acquitted.

2. Idaho Code § 19–2719 codifies the procedure for post-conviction proceedings in capital cases. It requires that petitions for post-conviction relief be filed in one single petition, *Pizzuto v. State*, 127 Idaho 469, 903 P.2d 58, 60 (1995), and

within 42 days after filing of the judgement from which relief is sought, *Paz v. State*, 123 Idaho 758, 852 P.2d 1355, 1356 (1993), except for petitions raising claims which are not known or not reasonably knowable within that 42–day period. *State v. Rhoades*, 120 Idaho 795, 820 P.2d 665, 677 (1991).

pursuant 28 U.S.C. § 2253 (1951).[3]

We review the district court's dismissal of a habeas petition as abusive or successive for abuse of discretion. *Williams v. Calderon,* 83 F.3d 281, 286 (9th Cir.1996). "The district court abuses its discretion if the court's decision is based on 'an erroneous legal conclusion or on a clearly erroneous finding of fact.'" *Id.* (quoting *Campbell v. Blodgett,* 997 F.2d 512, 516 (9th Cir.1992)). Pursuant to 28 U.S.C. § 2254(d), the factual findings of the state court are presumed correct. *Poland v. Stewart,* 117 F.3d 1094, 1103 (9th Cir.1997). We may affirm the district court on any ground fairly supported by the record. *Martinez–Villareal v. Lewis,* 80 F.3d 1301, 1305 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

### 2.

Under Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the answer to a habeas petition "shall state whether the petitioner has exhausted his state remedies." A petition containing any claims not exhausted in state court must be dismissed in its entirety. *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). But failure to exhaust state remedies does not deprive appellate courts of jurisdiction. *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 1673–74, 95 L.Ed.2d 119 (1987). When the state remains silent, the courts of appeals "exercise discretion in each case to decide whether the administration of justice would be better served by insisting on exhaustion or by reaching the merits of the petition forthwith." *Id.* In that circumstance, the court may "consider it [the exhaustion requirement] waived if the interests of comity, federalism and justice would be served." *Stone v. Godbehere,* 894 F.2d 1131, 1135 (9th Cir.1990). *See also Paradis III,* 954 F.2d at 1488.

The respondent Warden ("State") has informed neither the district court nor this court whether Paradis has exhausted his state remedies. Paradis brought his unsuccessful motion to augment his petition and conduct discovery in the light of new evidence before the Idaho Supreme Court under Idaho Appellate Rule 44, a discretionary rule requiring extraordinary circumstances. The new evidence gave rise to new claims which Paradis included in his second petition. The second petition therefore does not comport with the total exhaustion requirement of *Rose v. Lundy.*

However, we consider it waived because a resulting third petition for state post-conviction relief would not serve the interests of comity, federalism and justice for several reasons. First, to reject Paradis' claims for want of total exhaustion would strain judicial resources of the state and the federal courts even further in a criminal case that has occupied the courts since 1980. Second, it is in the interest of justice to expedite the case at hand for the sake of finality. Finally and most importantly, Paradis, were he not granted relief by the State, would be effectively barred from ever bringing his petition for habeas relief based on the newly-discovered evidence in federal courts pursuant 28 U.S.C. § 2244(d)(1)(D) (1996), as added by the AEDPA. As further discussion will reveal, such a development would be inequitable and not in the interest of justice.

We therefore conclude that the exhaustion-of-state-remedies requirement has been waived by the State and insisting on it is not mandated by considerations of comity, federalism and justice.

### 3.

This is Paradis' second petition for habeas relief in the federal courts. Federal habeas corpus relief is limited to claims that allege a constitutional violation in the state criminal proceedings. *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993); *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). Paradis is barred from bringing

---

**3.** This appeal was filed prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The amendments made by the AEDPA, thus, do not affect this appeal. *See Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood,* 114 F.3d 1484 (9th Cir.1997) (en banc).

any claim in a repeat habeas petition if it has been procedurally defaulted in state proceedings, is successive, or is otherwise abusive, unless he can show either absence of deliberate abandonment and inexcusable neglect for not raising it in an earlier petition or a miscarriage of justice if the claim were not addressed on its merits. *Sawyer v. Whitley,* 505 U.S. 333, 338–39, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992); *McCleskey v. Zant,* 499 U.S. 467, 493–95, 111 S.Ct. 1454, 1469–71, 113 L.Ed.2d 517 (1991).

### B.

Paradis alleges that his trial counsel, William V. Brown, ("Brown"), suffered from a conflict of interest while acting as his appointed defense counsel during the criminal trial. The district court ruled that the claim is a successive claim of ineffective assistance of counsel; that even if not successive, it is abusive; that Paradis was inexcusably neglectful in not bringing the claim earlier; and that no miscarriage of justice results from not addressing the merits of this abusive claim.[4]

■■■■ The Sixth Amendment's right to counsel, includes the right to assistance by a conflict-free attorney. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). Any claim of conflict of interest between defendant and attorney is analyzed under the standard developed for analysis of conflicts of interest due to representation of multiple defendants by a single attorney. *Garcia v. Bunnell,* 33 F.3d 1193, 1198 n. 4 (9th Cir.1994), *cert. denied* 514 U.S. 1024, 115 S.Ct. 1374, 131 L.Ed.2d 229 (1995). A conflict of interest constitutes a violation of a defendant's Sixth Amendment rights, if his attorney actively represented conflicting in-

terests and if the representation actually affected the attorney's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980); *Quintero v. United States,* 33 F.3d 1133, 1135 (9th Cir.1994).

■■■■ The district court found that Brown was employed as a city park police officer with the Coeur d'Alene police department when he was appointed to represent Paradis and while he represented Paradis at his trial. Paradis contends that this circumstance constitutes a conflict of interest. However, it falls short of a constitutional violation because there is no showing that Brown *actively represented* conflicting interests. Because the city police of Coeur d'Alene, let alone its park police, were not involved in the investigation of Palmer's murder, no conflict of interest flows *eo ipso* from Brown's additional employment. Potentially divided allegiances do not constitute active representation of conflicting interests. *See Bonin v. Calderon,* 59 F.3d 815, 827 (9th Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). *See also Garcia v. Bunnell,* 33 F.3d at 1199 (mere fact of future employment as prosecutor did not engender conflict of interest for defense attorney); *Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718 (multiple representation alone does not create a conflict of interest between attorney and several defendants).[5]

The district court did not abuse its discretion in rejecting this claim.[6]

### C.

Paradis contends that the prosecution violated his constitutional rights under *Brady*

---

4. Although the Idaho Supreme Court dismissed Paradis' second petition for post-conviction relief on procedural grounds, the state does not rely on the procedural bar. However, since abusive and procedurally defaulted claims are reviewed in the same manner, *McCleskey,* 499 U.S. at 494, 111 S.Ct. at 1470, this waiver does not affect this appeal.

5. In cases of attenuated or merely potential conflicts of interest, a petitioner is not precluded from making a *Strickland* claim, which requires a showing of actual unreasonableness of counsel's performance and resulting prejudice. *See*

*Strickland v. Washington,* 466 U.S. 668, 692–94, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984); *Bonin v. Calderon,* 59 F.3d at 827. This avenue, however, is closed to Paradis because he unsuccessfully alleged a *Strickland* claim in his first federal petition.

6. Because Paradis has failed to show an active conflict of interest by Brown, we need not address his further contentions that this claim is not abusive or successive and that cause and prejudice exist for not raising it earlier.

*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it withheld notes made by prosecutor Mark Haws ("Haws") at a briefing on the medical evidence. These notes, he claims, contain evidence that would have impeached the testimony Dr. William J. Brady ("Dr. Brady") who conducted the autopsy of Palmer's body and testified as the prosecution's expert witness that the murder had been committed in Idaho. The district court ruled that the claim was successive because it attacks the medical evidence proffered by the prosecution as false or misleading and thus as not being sufficient to locate the death in Idaho. Viewing the claim in that light, the district court believed it added nothing to the evidence at the first habeas hearing which ultimately left the status of the medical evidence inconclusive. *See Paradis II,* 667 F.Supp. at 1376–82. "The [district] court place[d], as did the Idaho Supreme Court, little significance and secondary importance on the medical evidence." *Id.* at 1384. However, the district court misconstrued Paradis' *Brady* claim.

### 1.

A *Brady* violation is committed when the prosecution fails to disclose evidence that is "favorable to an accused" and "material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. This rule extends to impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985); *United States v. Alvarez,* 86 F.3d 901, 904 (9th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 748, 136 L.Ed.2d 686 (1997). Moreover, failure to request particular evidence does not relieve the government of its burden to disclose exculpatory or impeaching evidence, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84. *See also Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). To succeed on this claim, Paradis therefore needs to show

that: (1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment. *See United States v. Steinberg,* 99 F.3d 1486, 1489 (9th Cir.1996).

On January 12, 1996, Paradis discovered that Haws had taken handwritten notes shortly after Palmer's autopsy which depict Dr. Brady to have held the opinion that Palmer did not die in the creek in which her body was found.[7] The location of Palmer's death was crucial in more than one respect. The theory of Paradis' defense was that Currier and Palmer were both killed by others at Paradis' house in Spokane at a time when Paradis was not present. Indeed, Paradis had been tried and acquitted in Washington for the murder of Currier. If Palmer was killed at the creek in Idaho, however, then Paradis was almost certainly involved in her murder rather than merely in the disposal of her body. Location of the murder in Idaho was also essential to the Idaho court's jurisdiction.

Paradis has alleged a genuine *Brady* violation. The evidence probably would have impeached Dr. Brady's testimony in its important respects. The evidence should have been produced because there is a reasonable probability that the outcome of the trial would have been different, if the defense had had access to it at the trial. And because it directly pertains to the question of Idaho's jurisdiction of the case, the suppression of the evidence was material to Paradis' guilt of, and punishment for, killing Palmer in Idaho as presented by the prosecution.

The district court misconstrued Paradis' claim of a *Brady* violation as an attempt to "show that Dr. Brady's testimony was wholly conjectural and without any scientific or factual basis and was developed on the eve of trial solely for the purposes of advocacy to obtain a conviction." It dismissed the claim by seeking recourse in a conclusion from Paradis' first petition for habeas corpus relief: "[P]etitioner's attack upon the sufficien-

---

**7.** Paradis also discovered a memo from state investigator Jack Pintler ("Pintler") to Haws concerning the whereabouts of some of Palmer's underwear before and after her murder. This newly-discovered evidence is discussed in Part IV.F, below.

cy of the Brady autopsy and report on Palmer has failed." (Quoting *Paradis II,* 667 F.Supp. at 1392.)

A *Brady* claim does not aim at undermining the sufficiency of the evidence, although it may have that effect, because "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. at 434, 115 S.Ct. at 1565–66. The newly-discovered evidence cannot therefore be discounted simply on the ground that it reveals no medical opinion that has not been already expressed at the criminal trial or at the first habeas evidentiary hearing. Rather, the import of the newly-discovered evidence lies in the fact that it was Dr. Brady who appears initially to have held an opinion in square conflict with his later in-court testimony.

The district court's mischaracterization of this newly-discovered evidence as going to the sufficiency of the evidence was an abuse of its discretion. *See id.* (*Bagley* materiality "is not a sufficiency of the evidence test"); *Steinberg,* 99 F.3d at 1491 (one shows a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict") (quoting *Kyles v. Whitley,* 514 U.S. at 435, 115 S.Ct. at 1566).

**2.**

Having mischaracterized this claim, the district court concluded it to be successive. For the reasons just stated, the district court abused its discretion in finding the claim successive on those grounds.

There were other grounds in the record from which to find the claim successive, however. Paradis' first petition for habeas relief alleged two *Brady* violations.[8] The newly-discovered evidence thus serves to support a legal ground for relief brought previously and adjudicated on its merits. The claim is therefore successive, *see Campbell v. Blodgett,* 997 F.2d at 516, and is barred, unless Paradis can show cause and prejudice.

**3.**

Paradis contends that he could not have known about the new evidence before January 12, 1996.

In order to establish cause for this successive claim, Paradis must show that he could not have known of it during his first habeas petition. To establish cause he must show that "some objective factor external to the defense" prevented him from bringing the claim earlier. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986). Paradis also must show that he will suffer prejudice if his claim is not addressed. *Wainwright v. Sykes,* 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). The prejudice standard was initially left imprecise. *Id.* In *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Court ruled that to meet the prejudice standard under *Sykes,* the petitioner must establish that the error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170, 102 S.Ct. at 1596 (emphasis in original). To ascertain the level to which such errors taint the constitutional sufficiency of the trial, they must "be evaluated in the total context of the events at trial." *Id.* at 169, 102 S.Ct. at 1595. Paradis has met this high standard for prejudice.

**a.**

Paradis' lawyers obtained Haws' notes from Christopher R. Osborn ("Osborn"), the attorney for Gibson, after Gibson, an inmate at the Idaho State Correctional Institution, indicated to Paradis that Osborn had received copies of the pertinent documents from the files of the Kootenai County Prosecutor's Office. Paradis promptly informed his counsel, who contacted Osborn, who in turn forwarded copies of them to Paradis' counsel on January 12, 1996. Osborn had originally gained access to the documents

---

8. Namely, failure to preserve and disclose exculpatory evidence by permitting the cremation of Palmer's body and losing items from Paradis's Spokane residence.

when he subpoenaed them in an effort to reconstruct lost transcripts from the Gibson trial.[9] Neither at the time of his first habeas petition nor at the time of the criminal trial could Paradis reasonably have known of these documents.

In 1987, prior to the evidentiary hearing on his first federal petition, Paradis' subpoena of documents from the Kootenai County Prosecutor's Office was quashed at the State's request. During the criminal trial, Brown made a request for disclosure pursuant to Idaho Criminal Rule 16, but the prosecutor did not reveal any of the evidence now under scrutiny. We therefore conclude that Paradis was prevented by outside factors from bringing an earlier *Brady* claim based on evidence impeaching the testimony of Dr. Brady and that he therefore had cause for not bringing it. The district court's finding otherwise is clearly erroneous and thus an abuse of its discretion.

**b.**

We next consider whether Paradis suffered prejudice from the prosecutor's failure to disclose the exculpatory or impeaching evidence. The district court "hesitat[ed] to ascribe meaning to a work product that so obviously requires interpretation by the author." We do not agree that the notes are as cryptic as the district court suggested. In fact, a sufficient part of the notes is susceptible to unproblematic interpretation.

The first sheet of longhand notes ("Notes I"), summarizing the "pathologist report" on June 24, 1980, the day after Dr. Brady had performed the autopsy on Palmer's body, gives the following information: "Victim female $V_F$—strangle;" "V strangled;" "spoonful water in lungs—siphon prob—dead when went in water;" "not sexually assaulted." The probable interpretation of these notes is that Brady found Palmer to have died of strangulation, that she was dead when her body went into the water and that she was not sexually assaulted shortly before, during, or after her killing.

A second sheet of longhand notes ("Notes II") contains the following information: "Did not die by drowning but by normal strangulation;" "nothing noteworthy in those lungs of Kimberley [sic] Ann Palmer;" "difficult to chart the two deaths & compare time of death;" "nothing in lungs to contradict manual strangulation." These phrases are easily converted to complete sentences by making the following obvious insertions at the beginning of each phrase: "Palmer," "There is," "It is," and "There is."

A third set of longhand notes ("Notes III") contains, *inter alia*, this information under the underlined title *"Dr. Brady"*: "wound—outside genitalia—tear—enlarged/after death—cut under tear on jeans/right before—death—;" "cut—1" [sic] [10] long—evid no bleeding (jeans—bleeding?). The last part is marked by a prominently emphasized star, the only one in Notes III. While the last notes cannot easily be turned into complete sentences, they nonetheless make it appear that the prosecutor clearly thought it important that a tear inflicted on one of Palmer's labia majora did not bleed.

During the trial, Dr. Brady testified for the prosecution that the condition of the lungs was of importance to his examination, and that their appearance was not consistent with a textbook case of manual strangulation because they were heavy and filled with fluid. He then expressed his opinion that the lungs would have assumed such an appearance if Palmer had been manually strangled and immediately afterwards placed face down in water, concluding that immersion played a causal role in Palmer's death—that she aspired water once she had been immersed in the creek.

Dr. Brady did not testify concerning the labial tear. Brown testified during the evidentiary hearing that he deliberately omitted a discussion of this issue because he feared it would raise the specter of sexual abuse.

---

9. Gibson's trial for Palmer's killing was severed from Paradis' trial. *See State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983); *Gibson v. State*, 110 Idaho 631, 718 P.2d 283 (1986).

10. The autopsy report describes the wound on the labium majus as a tear, not a cut, and of 1½", not 1", in length. The record in the prior proceedings is consistent with the autopsy report. This discrepancy is immaterial.

However, Dr. Charles P. Larson ("Dr. Larson"), the medical expert for the defense, addressed this issue, stating that the injury appeared to be post-mortem and speculated that it was inflicted when the body was passed over a barbed wire fence between Mellick Road and the creek. It is overwhelmingly likely that if the tear did not bleed, it was inflicted post-mortem more than half an hour after the death. Had it been inflicted pre-mortem or peri-mortem, it would have bled profusely since the genital area is highly vascularized. Since Paradis, Gibson and Evans were at the Mellick Road side for only about 30 minutes, Palmer's death would have to antedate the entire episode there, the last apparent occasion for inflicting the wound. A death at Mellick Road, which Dr. Brady claimed compatible with the medical evidence, would appear to become severely implausible in the light of his own prior findings.

Dr. Brady also testified that it was his opinion that Currier had been dead for several more hours than Palmer because the decomposition of his body had progressed further than hers. Dr. Larson testified that the temperature differential between a half-naked body in a creek and a body wrapped into a closed sleeping bag would make the former decompose more slowly than the latter.

Dr. Brady's testimony conflicts with his own prior opinions expressed in the notes, but the defense was not given a chance to investigate this conflict or to cross-examine on it. In the light of the new evidence, it appears that Paradis' defense suffered from an "actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596. In the context of all the events at trial, it appears that Brown probably would have chosen a different approach in discussing the labial tear, had he known that no sexual assault occurred and that it was considered highly important medical evidence. The defense was put at an actual disadvantage because an inference from the state of the labial tear to the time and location of Palmer's death, in the light of Dr. Brady's initial opinion, would likely have evoked reasonable doubt in a jury that Palmer died in Idaho, as argued by the prosecution from circumstantial evidence.

The disadvantage was substantial because self-contradictory opinions by Dr. Brady probably would have undermined confidence in the compatibility of the medical evidence with the prosecution's theory that Palmer died in Idaho. And the disadvantage was of constitutional dimension because it affected the way in which Brown conducted the part of the trial which could well have exculpated Paradis, implicating a violation of his constitutional guarantee of due process. We cannot have confidence in the outcome of the trial short of a fully informed cross-examination of Dr. Brady that would have confronted him with what appear to be opinions which he held shortly after the autopsy when his memory of the details was freshest, but which plainly contradict important parts of his testimony at trial.

▮ The State suggests that Paradis could not suffer prejudice if his successive claim were not addressed, because the medical evidence was of secondary importance in the actual trial in which circumstantial evidence sufficiently supported that Palmer died in Idaho. *See also Paradis II*, 667 F.Supp. at 1393; *Paradis III*, 954 F.2d at 1487. This contention misconstrues the prejudice standard. Paradis is not required to produce clear and convincing evidence that Palmer was not murdered in Idaho in order to show prejudice from a *Brady* violation. He need only show that his due process rights were impeded by the non-disclosure so that he suffered an actual and substantial disadvantage. The measure of prejudice is the trial he would have been afforded had he not been disadvantaged; it is not the trial that he actually had. That the actual trial evidence is sufficient to convict him in no way undermines that he was at an actual and substantial disadvantage of constitutional dimension at that trial. We therefore conclude that Paradis has shown actual prejudice from the non-disclosure of Haws' notes. The district court's finding otherwise is clearly erroneous and thus an abuse of its discretion.

### D.

Paradis alternatively claims that, even if his showing of cause and prejudice was defective, he is entitled to relief because a miscarriage of justice would result if the merits of his constitutional claims, including his *Brady* claim, were not reached. The district court found that Paradis had not made a sufficient showing of the requisite actual innocence.

 Even when cause and prejudice cannot be established, procedurally defaulted, successive ·or otherwise abusive claims brought in a repeat habeas petition will be addressed on their merits when necessary to serve the ends of justice. *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078–79, 10 L.Ed.2d 148 (1963). These ends are served if refusal to review his constitutional claims made him fall "within the 'narrow class of cases … implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995) (quoting *McCleskey*, 499 U.S. at 494, 111 S.Ct. at 1470). A claim of actual innocence creates membership in that class. *Schlup*, 513 U.S. at 315, 115 S.Ct. at 861.

 Claims of innocence require the petitioner to make a 'colorable claim' of actual innocence in the light of all available evidence. *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986). In the case of procedural claims of innocence, *i.e.*, those claims of innocence that serve merely as a gateway for consideration of independent constitutional claims, a colorable showing amounts to establishing that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence. *Schlup*, 513 U.S. at 314, 327, 115 S.Ct. at 860–61, 867.

 The district court employed an erroneous legal standard to establish a procedural claim of innocence. Because the district court misconstrued Paradis' *Brady* claim, it did not analyze his guilt or innocence in the light of Haws' notes. Rather, it concluded that short of a genuinely new opinion not yet expressed by some medical expert or other, the prior assessment of the medical evidence as inconclusive, secondary and outweighed by the circumstantial evidence survives unscathed. *See Paradis I*, 676 P.2d at 35; *Paradis II*, 667 F.Supp. at 1384–85; *Paradis III*, 954 F.2d at 1487–88. It consequently maintained that "there is a strong case sustaining the guilt of the petitioner based on the circumstantial evidence presented at trial." As the district court applied an erroneous standard for the showing of actual innocence here, it abused its discretion.

 It also abused its discretion in finding that the new evidence has no import on previous evaluations of the totality of medical evidence. In the light of Haws' notes which allegedly recorded Dr. Brady's opinions immediately after the autopsy, the medical evidence strongly suggests that: (1) there is no evidence showing affirmatively that Palmer died in Idaho; and (2) there is exceedingly strong evidence that Palmer was dead by the time her body entered the creek below Mellick Road. Under such an assessment of the medical evidence, the circumstantial evidence relied upon in Paradis' conviction would be ·conclusively contradicted by the medical evidence available from the record. Thus, it may be more likely than not that no reasonable juror would have found Paradis guilty beyond reasonable doubt of having killed Palmer in Idaho.

### 1.

The relevant contentious medical evidence in this case consists of: (a) the condition of Palmer's lungs; (b) the comparative state of decomposition of Palmer's and Currier's bodies; (c) the labial tear; and (d) the presence of blood at Palmer's ear and nose. Other medical evidence has been the subject of discussion in prior proceedings, but does not seem affected by the new evidence and has not been found to tip the evidentiary balance one way or the other. *See Paradis II*, 667 F.Supp. 1376–82.

We first discuss whether the decomposition evidence and the state of Palmer's lungs are immaterial to determining the location and time of her death. At trial, Dr. Brady testified that, in his opinion, the differential progression in decomposition of their respective bodies indicates that Currier died sever-

al hours before Palmer. At the evidentiary hearing, Dr. Brady maintained that Currier's body had decomposed more rapidly because of such factors as temperature. That the difference in decomposition does not permit an inference as to the temporal order of death was also maintained by Paradis' expert witness at the criminal trial, Dr. Larson, and his expert witness at the evidentiary hearing, Dr. Frank A. Roberts. Notes I mention that "no time of death [for] either" person can be ascertained, and Notes II state that it is "difficult to chart the two deaths [and to] compare [their] time of death." In the light of these expert opinions, any support the theory of Palmer's death in Idaho received from a comparison of the two bodies' relative state of decomposition vanishes.

The most contentious medical issue during the first habeas petition was whether Dr. Brady's testimony regarding the relevance of the condition of Palmer's lungs for determining her death was false. The district court concluded that his testimony at trial and during the evidentiary hearing was not contradictory. Notes I record Dr. Brady as saying that there was a "spoonful [of] water in [the] lungs" and that Palmer was "dead when [her body] went in[to] the water" of the creek. Notes II record him with the opinion that Palmer "did not die by drowning but by manual strangulation" and that there was "nothing noteworthy in those lungs of Kimberl[y] Ann Palmer." He testified during the criminal trial "that the immersion in the water, the aspiration of water played a role, if not the terminal event, in this girl's death after she was strangled." He stated that he believed "she was strangled, and shortly afterwards aspirated some amount of water during her terminal, during her last moments with her last breath, . . . she inhaled some water." The opinion recorded in the notes contradicts the opinion espoused at trial. During the first habeas proceeding, Dr. Brady held the aspiration of water to be the best explanation of the increased weight, the collection of fluid and the overall appearance of Palmer's lungs. However, he left ultimately unclear with what strength he held the opinion as he maintained that the state of the lungs *fits* with a causal role for the aspiration of water in Palmer's death, that it *is charac-*

*teristic* thereof, and that it *is a reasonable explanation,* but none he held with reasonable medical certainty.

In the light of the newly-discovered evidence, Dr. Brady holds one opinion too many to retain the conclusion, adopted by the district court from the court of the first habeas petition, that his opinions are consistent with each other. Dr. Roberts' testimony and the affidavits by Dr. Todd Grey, Dr. Kris Sperry and Dr. Donald Reay, which accompany this petition, unequivocally set forth that the presence of significant amounts of fluid in the victim's lungs is common after manual strangulation, that expanded and fluid-filled lungs are non-specific and of no probative value and that the lungs' weight and the presence of fluid in them do not allow an inference that water was aspirated.

In the light of what appears in Haws' notes to be Dr. Brady's inconsistency, the condition of the lungs has no probative role for the theory that the aspiration of water (which connected her death with the creek) played a causal role in Palmer's death. Without any evidence material to that theory, the facts support only that Palmer died of manual strangulation, but not that she died in Idaho.

**2.**

The labial tear and the presence of blood at Palmer's ear and nose also cast strong doubt on the theory of Palmer's death in Idaho. Notes III suggest that Dr. Brady found the tear in Palmer's left labium majus not to have bled and that the prosecution attached importance to that finding. In the autopsy report, he noted to have found no vital reaction (healing or scabbing). During the trial, Brown did not discuss the wound with Dr. Brady. Dr. Larson's testimony indicates that from the wound alone a pathologist could not always determine whether it was inflicted before or after death, especially when it was inflicted very shortly after death. At the first evidentiary hearing, Dr. Roberts testified that he inferred from the description of the wound as showing no vital signs that it was inflicted post-mortem. Dr. George R. Lindholm, expert witness for the State during the evidentiary hearing, testified that the

wound appeared to be post-mortem. Had it been inflicted peri-mortem, it would have bled profusely. Dr. Brady stated that the condition of the wound was consistent with its peri-mortem infliction.

Palmer wore unzipped and unbuttoned jeans that tightly fit her body. The jeans were pulled up to her waist as she lay face down in the creek, her body pointing downwards, with her head downmost. Most of the labial area appears covered by the jeans. A test under ultraviolet light before the trial revealed no traces of blood on the jeans. No chemical tests were conducted until the evidentiary hearing, at which Pamela J. Marcum, a witness for the State, testified that a luminol test, a very sensitive chemical test that can detect remnants of blood in clothing even after repeated washing, had revealed that no blood was found in the jeans.

At Larry Evans' trial, Dr. Brady opined that the absence of blood in the jeans is explained by the fact that the unzipped and unbuttoned jeans allowed the blood to flow from the tear along the inverted body down the pubic region towards the abdomen. Since the body was partly immersed in water, the blood would then have to be washed off the body by water from the creek or from rain. Dr. Brady conceded that for him this theory was the only one not making the absence of blood from the jeans unfathomable.[11]

If the new evidence that blood was present around Palmer's nose and ear is given full credence, it is more likely than not that no reasonable juror would find this conclusion, or Dr. Brady's theory, to be sustainable. Notes III contain the information that blood was in the area of the ear and the nose, followed by the hypothesis that the bleeding "could have immediately followed strangulation." At the first evidentiary hearing, Paradis challenged the completeness of the autopsy report, *inter alia*, because it was missing any comment about an injury to the ear visible on some photographs taken during the autopsy. Dr. Bra-

dy then testified that he had no recollection other than the photos of having found any such wound and that it appeared not to be blood, but the marks of tissue, rubbed off in the process of the autopsy, at which it could easily have happened because the skin had been immersed in water for a long time.

In the light of the new evidence, it is certainly possible, if not probable, that no reasonable juror would find this position tenable. It is true that photos taken of Palmer's dead body lying in the creek do not reveal to what extent she was immersed in the water during the 30 hours it lay there. However, the head lay lower than the rest of the body, including her genital area. Thus, her labia, pubic region and abdomen were not immersed in the water unless her head was also immersed in water. For this reason, the possible solutions to the problem of the missing blood from Palmer's labia offered by Dr. Brady in Haws' notes (and by this court) more probably than not would be inconceivable to any reasonable juror. Had the creek, the rain, or their combination, been powerful enough to wash out of the jeans fabric the blood gushing from a profusely bleeding wound so that not a single trace could be detected by a very sensitive chemical test, it is more likely than not that no reasonable juror could conceive how blood could have remained at an equally exposed nose and ear. And had the creek, the rain, or their combination, been powerful enough to wash away every last trace of blood flowing down the pubic region along Palmer's lower abdominal area, it would be equally inconceivable to any reasonable juror how blood could have remained at an equally exposed nose and ear. There appears to be no rational explanation how the wound could have been inflicted pre-mortem or peri-mortem with absolutely no trace of blood remaining on either Palmer's jeans or her body. It is possible the district court will conclude that it is more probable than not that no reasonable juror could have found Dr. Brady's speculation plausible in

---

**11.** On appeal in the first federal habeas proceeding, this court held that "the lack of blood on Palmer's jeans does not render the jury's verdict irrational. The jury could have rationally inferred from all the evidence that any blood on the jeans was washed away by the combined effect of rain water and the flow of the stream." *Paradis III*, 954 F.2d at 1487. In light of the newly-discovered evidence, it is unlikely that any reasonable juror would find this theory tenable.

the light of the conservation of blood on other parts of Palmer's body that were equally exposed to the elements.

We therefore conclude that the circumstantial evidence on which Paradis' conviction relied is undermined. It is similarly possible that the district court will conclude that no reasonable juror could find from the medical evidence available in the record that Palmer was alive when her body entered the creek at Mellick Road. The wound must have been inflicted well after her death, clearly more than the 30 minutes which Paradis, Gibson and Evans would have had, had they killed Palmer at Mellick Road.

The circumstantial evidence of Palmer's lungs and state of decomposition is an insufficient basis from which a reasonable juror could determine the time and place of her death. The absence of blood on her lower abdominal area, pubic region and jeans, in conjunction with the presence of blood at her nose and ear, will likely lead any reasonable juror to conclude that her labial tear was inflicted more than 30 minutes after her death. The district court therefore abused its discretion in not finding Paradis to have shown actual innocence according to the *Schlup* standard.

### E.

Paradis alleges a further *Brady* violation in the prosecution's withholding that it had contacted and listed as a potential witness Dr. Donald Reay whose evaluation of Dr. Brady's autopsy report, according to an affidavit now submitted, contradicts some of Dr. Brady's opinions on this matter. However, Paradis admits that Dr. Reay's name was revealed in response to a discovery request by Brown, albeit the night before the trial. Thus, Dr. Reay's name was on a preliminary list of witnesses and was not withheld.

Paradis argues that this disclosure of a potential witness' name alone nonetheless constitutes a *Brady* violation, because it was not revealed in a context permitting an evaluation of its exculpatory character. This claim, if true, does not reduce the disclosure of Dr. Reay's name to a non-disclosure. Rather, it derives from the previous *Brady*

claim that the content of Haws' notes is exculpatory and should therefore have been disclosed to Paradis' trial counsel. Hence, no additional *Brady* violation is established.

### F.

Paradis submits further that a *Brady* violation was committed when, upon a request for disclosure prior to the trial, a memorandum from Jack Pintler to Haws about the testimony of Sheri Owens ("Owens"), Palmer's mother, concerning Palmer's underpants was edited to remove exculpatory evidence. A response on this issue by the state is conspicuously absent. The district court found the evidence not to be exculpatory, the claim to be successive and Paradis not to have established cause for bringing it a second time. The district court did not abuse its discretion in so finding.

Among the documents disclosed by the prosecution was a memorandum from Pintler to Haws from May 4, 1981, which states that Owens remembers Palmer leaving their shared residence without wearing underpants and without having packed any in her luggage. She further remembered Palmer wearing tight jeans and explained that Palmer preferred not to wear underpants under tight fitting jeans to avoid a publicly-visible panty-line. A now disclosed confidential memorandum from Pintler to Haws, dated April 10, 1981, contains the additional information that four pairs of underpants had been found in the overturned Volkswagen at Mellick Road. The four pairs resembled a pair, which later proved irretrievable, found wrapped in a blood-soaked rug underneath a clothesline in a laundry/cleaning room in Paradis' residence in Spokane.

Palmer's body was found without underwear. Paradis argued that the resemblance between the underwear in Paradis' residence and that in the van would place the death of Palmer in Washington. He also suggests that the prosecution had to rely on the theory that nothing connected Palmer with Paradis' residence in Spokane to place her death in Idaho.

The district court found that the mere resemblance "adds nothing to the case."

Paradis did not prevail during his first habeas petition with the claim that the presence of a pair of women's underpants in his residence establishes that Palmer was killed there. *Paradis II,* 667 F.Supp. at 1375–76. The first habeas court's conclusion that the underpants in Spokane provide no exculpatory evidence, *id.* at 1391, was not substantially weakened by the disclosure that four pairs of similar underpants were found in the van. Since identity of brand, color, size, or ownership was not established, the court deemed the presence of the underpants in Spokane still not exculpatory. This finding is not clearly erroneous. The district court therefore did not abuse its discretion.[12]

### G.

Paradis contends that he had cause for not bringing five witnesses to testify on his behalf at the first habeas proceeding. This suggests that he wants to raise a claim that might be successive or abusive, but he does not state what that claim is. Nor can we find one. He may well have been incapable of bringing these five witnesses whom neither he nor the prosecution could locate, subpoena, or even knew to have witnessed events surrounding the killings of Palmer and Currier. But we are aware of no legal theory under which this inability constitutes a constitutional violation. *Cf. United States v. Ross,* 123 F.3d 1181, 1185 (9th Cir.1997) ("some government culpability must be shown to prove a deprivation of due process") (citation omitted). Since we cannot ascertain what constitutional claim is being made, we can neither find nor not find cause for not bringing it earlier.

The district court was similarly perplexed. We find no abuse of discretion by the district court in dismissing this claim.

### V. CONCLUSION

We affirm the district court's dismissal of Paradis' second petition for habeas corpus relief with respect to his claims of conflict of interest, alleged *Brady* violation with regard

to the non-disclosure of Dr. Reay's name on a list of potential witnesses, alleged *Brady* violation with regard to Pintler's memorandum to Haws, and his non-constitutional claim involving new witnesses. We reverse the district court's dismissal with respect to Paradis' *Brady* claim with regard to Haws' notes of Dr. Brady's post-autopsy opinions and remand for an evidentiary hearing on that claim and such further proceedings as may be required consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

---

12. Because finding the additional underpants in the van does not genuinely allege a *Brady* violation, we do not need to discuss whether this claim was successive and whether Paradis can show cause and prejudice.