**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

ILLYA BOND, aka Frank Akbery,
            *Defendant-Appellant.*

No. 06-50628

D.C. No.
CR-05-00660-PA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
June 5, 2008—Pasadena, California

Filed January 20, 2009

Before: David R. Thompson, Diarmuid F. O'Scannlain, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

Roger S. Hanson, Santa Anna, California, argued the cause for the defendant-appellant and submitted briefs.

Patrick Jasperse, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, argued the cause for the plaintiff-respondent and submitted a brief. Kenneth L. Jost, Office of Consumer Litigation, U.S. Dept. of Justice and Thomas P. O'Brien, United States Attorney for the Central District of California were on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the government withheld *Brady* information from a defendant in a wire fraud prosecution arising out of an electric power sales scheme in the deregulated California market.[1]

I

In 1998, California deregulated its electricity industry, which, at the time, consisted of three major companies: Pacific Gas & Electric, Southern California Edison, and San

---

[1] In a concurrently filed memorandum disposition, we address Bond's additional challenges to the district court's decision. *See United States v. Bond,* No. 06-50628 (9th Cir. Jan. 20, 2009).

Diego Gas & Electric. Although these utilities continued to transmit and to distribute electricity, after deregulation California customers could choose to buy their power from the regional supplier, or they could select a different electric service provider ("ESP").

A

Attracted by the business opportunity presented by deregulation, Defendant-Appellant Bond bought an inactive shell company in 1998 that had previously been involved in providing electricity and formed PowerSource Corporation ("PowerSource"). Bond was its chief executive officer, and marketed the company as an ESP that would provide residential and commercial electricity throughout the state. PowerSource did not operate its own power stations. Rather, the company purchased electricity from other sources and then sold it to its customers at a slight mark-up.

PowerSource divided California into 39 districts in which it would sell power. It planned to have each district financed by a partnership that would contribute capital in return for a percentage of PowerSource's profits from that district. PowerSource hired Power Capital Funding Group ("PowerCapFunding") to sell the partnerships. PowerCapFunding was run by Ronald Johnson and James Miles.

PowerCapFunding, in turn, hired various telemarketing "boiler rooms" to sell units in the partnerships to investors. The boiler rooms (euphemistically called "independent selling organizations") then called individuals, in hope that they would be interested in buying into one of the partnerships. Interested individuals were sent further information by mail.

The telemarketing entities sold partnership units from late 1998 through summer 2001. Each partnership unit cost $10,000, and the investment plan anticipated that each partnership would encompass 60 partnership units. Once sixty

units had been sold, the partnership was closed and another partnership was opened.

The financing scheme was a scam. Numerous material misrepresentations and omissions were made to the potential investors by the telemarketers and in the printed marketing materials. PowerCapFunding, with input from Bond, created Partnership Memoranda that detailed the purpose and terms of the partnership offering. These memoranda stated that sales commissions on each investment unit would be between 15 and 45 percent. In fact, however, PowerCapFunding retained a 61 percent sales commission. The memoranda also contained misleading biographical information on Bond and other significant PowerSource figures. The memoranda further identified several individuals as serving in consulting or executive capacities who had never done so and had not given permission for their personal information to be included in the partnership marketing materials.

Also significant, the Partnership Memoranda included partnership income forecasts based on the number of customers PowerSource projected gaining in each particular district. These, too, relied on information Bond had provided. The first partnership memorandum, dated October 1, 1998, projected a $1.6 million profit in one of the districts. And even though PowerSource was not meeting its market penetration targets, the projections increased with each new partnership marketed to the investors.

PowerSource and PowerCapFunding also conducted conference calls with investors in each partnership. The purpose of these calls was to solicit additional investments and to reassure investors. Bond told the investors that after a year, they could convert their partnership units into PowerSource stock worth $12,500. In reality, the units were converted into worthless PowerSource Class B preferred stock. The investors were also erroneously told that PowerSource was successfully acquiring customers, that it had a state-of-the-art computer

system that could handle up to two million customers, and that its financial situation remained viable.

In the end, PowerSource never had more than 6,885 customers, and it struggled to perform the most basic business functions, like customer billing. In March 2001, PowerSource decided to return all of its customers to the three major electricity companies, and after July 2001, it had zero customers. Ultimately, the investors lost nearly $2.5 million, recouping at most $80 on each $10,000 investment.

B

In November 2002, FBI agents interviewed Bond, who stated that he had worked for PowerSource only from 1997-1999 and only as a consultant. He identified E. Douglas Mitchell as the CEO of PowerSource. Apparently, Bond's attempt to minimize his involvement with PowerSource was initially successful. In 2003, seven individuals connected to PowerSource, including Mitchell and Johnson, were indicted in the Southern District of Florida. Bond, however, was not among them. Six of these individuals pled guilty.[2] Mitchell, however, went to trial and was convicted of conspiracy to commit wire fraud and mail fraud in violation of 18 U.S.C. § 371. Several of the individuals who pled guilty, including Johnson, testified at Mitchell's trial. Bond was, of course, aware of the Florida proceedings and that various individuals with whom he had worked were testifying. In early 2005, the government specifically gave Bond's attorney the contact information for the court reporter transcribing the Florida trial.

---

[2]Three defendants pleaded guilty to one count of conspiracy to commit wire fraud and mail fraud in violation of 18 U.S.C. § 371. Two defendants pleaded guilty to both a § 371 violation and substantive wire fraud counts. The final defendant pleaded guilty to conspiracy to defraud the United States.

## C

In July 2005, Bond himself was indicted in the Central District of California for his role in the PowerSource/ PowerCap-Fund investment scheme. Specifically, he was charged with one count of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371, seven counts of mail fraud under 18 U.S.C. § 1341, three counts of wire fraud under 18 U.S.C. § 1343, and one count of making a false statement under 18 U.S.C. § 1001. Shortly thereafter, the government *again* gave Bond's counsel the contact information for the Florida court reporter. During the pre-trial proceedings in Bond's case, one of Bond's trial counsel also represented that he had, in fact, been in contact with the Florida court reporter and he had obtained at least some transcripts from the Florida proceedings.

In conversations with defense counsel, the government repeatedly referred to Johnson and some of the other individuals indicted in Florida as possible witnesses against Bond and specifically listed Johnson on the witness list it filed with the district court. Additionally, the government provided Bond's counsel with two agent interview summaries from when they had questioned Johnson, as well as agents' notes from several other meetings involving Johnson. However, the government ultimately decided not to call Johnson as a witness, and Bond failed to make any effort to subpoena him as a witness for the defense. Thus, Johnson never testified at Bond's trial.

The jury convicted Bond on all charges. The Pre-Sentencing Report ("PSR") submitted to the court concluded that Bond had a category three criminal history and that his base offense level was six. Among other sentencing enhancements, the report recommended a 16-level enhancement under U.S.S.G. § 2B1.1 for amount of loss between $1.0 and $2.5 million.

At the sentencing hearing, Bond raised numerous objections to the PSR, but he did not challenge the amount-of-loss

enhancement. In fact, Bond's counsel agreed that the "probation officer correctly analyzed and applied the guidelines." The district court, considering the relevant sentencing factors, sentenced Bond to the statutory maximum of 60 months' imprisonment on each of the 12 counts of conviction to be served partially concurrently and partially consecutively, for a total of 96 months' imprisonment. The district court further ordered Bond to pay $2,435,441 in restitution. Bond timely appealed.

## II

On appeal, Bond argues that Johnson's testimony would have been favorable to him and that the government "suppressed" such evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963)*,* by failing to call Johnson as a government witness after indicating that it would do so.

**[1]** Relying on *United States v. Aichele*, the government responds that where the "defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression." 941 F.2d 761, 764 (9th Cir. 1991) (citing *United States v. Dupuy*, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985)). The government contends that Johnson's testimony was not suppressed for *Brady* purposes because Bond was fully aware of Johnson's existence and the substance of his likely testimony, as Bond had received transcripts of Johnson's testimony in the Florida trial. *See Wright v. Hopper*, 169 F.3d 695, 702 (11th Cir. 1999) (holding government did not suppress witness' preliminary hearing testimony where the defense was aware of her and could have obtained a transcript of the prior proceeding or interviewed her). As such, the government contends that Bond could have secured Johnson's testimony by subpoenaing Johnson as a witness for the defense.

A

**[2]** The passage in *Aichele* relied on by the government is dictum. *Benn v. Lambert*, 283 F.3d 1040, 1061 (9th Cir. 2002). However, sitting en banc, we have held that a discussion in a published opinion from this court is binding circuit law "regardless of whether it was in some technical sense 'necessary' to [the] disposition of the case." *Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam). Accordingly, we are bound by this passage, at least in cases like *Aichele* where there was no government action to throw the defendant off the path of the alleged *Brady* information.[3]

Our conclusion is buttressed by the Court's decision in *United States v. Dupuy,* which also involved a witness statement for a trial of a multi-defendant drug conspiracy. 760 F.2d at 1495. The prosecutor ultimately entered into plea agreements with two of the co-defendants. She took notes during the plea negotiations which she agreed would remain confidential except for impeachment purposes. *Id.* at 1501. Just before trial began, however, the prosecutor determined that the notes contained *Brady* materials, and given her promise to keep such confidential, she approached the trial judge for instruction on what she should do. *Id.* The judge disclosed the identity of the two co-defendants to the defendant, and

---

[3]The case at bar is readily distinguishable from our recent decision in *Tennison v. City and County of San Francisco*, No. 06-15426, slip. op at 16083 (9th Cir. Dec 8, 2008). In *Tennison*, the police had conducted extensive and detailed interviews with a witness who possessed exculpatory information. We found a *Brady* violation because of the police officers' failure to share the information with the defense. While the defendants may have known to some limited degree that the witness "had information about the murder, [such] knowledge is not the same as [the witness'] extensive statements to the police." *Id.* at 16101. Here, both sides had access to Johnson's public testimony. *Cf. id.* (noting that the defendants did not even know the witness' name or "the extent of the information" provided by the witness, which included many specific details about the crime).

then, concluding that the defendant could "independently proceed to ascertain the *Brady* material," the judge placed the prosecutor's notes under seal without conducting an in camera review. *Id.* at 1501-02.

On appeal, we held that such action would have been appropriate had the defendant sought the co-defendants' *statements*, because "where a witness is involved '[t]he government is not required to make a [his] statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish.' "[4] *Id.* at 1502 (alteration in original) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2nd Cir. 1978)); *see also United States v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992) (holding there was no *Brady* violation where government decided not to call one of its witnesses who had recanted but failed to provide precise details of such recantation because the defendant had an opportunity to subpoena the witness). However, because the defendant was seeking access to the prosecutor's notes rather than to the witnesses' statements, the court remanded the case back to the district court for consideration of "whether disclosure of the notes might have affected the outcome of the trial." *Dupuy*, 760 F.2d at 1502-03.

### B

Nor is Bond's position aided by our decision in *Benn*. There, the government created a report concluding that arson had been committed, but did not disclose the opinions of certain of its experts that the fire was accidental. While the government produced the names of the experts, it "not only *failed to disclose* the crucial information about the accidental nature

---

[4]In a footnote, the *Dupuy* court further stated: "Since suppression by the Government is a necessary element of a *Brady* claim, if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails." 760 F.2d at 1502 n.5 (internal citation omitted).

of the fire, but . . . *actually misled the defense* by disclosing a part of the experts' findings that, read alone, would lead to a conclusion directly opposite to the one they reached." *Benn*, 283 F.3d at 1062 (emphases added). "A defendant furnished with such inculpatory evidence by the state is not required to assume that the state has concealed material information and has thereby obligated him to ascertain the *Brady* material on his own." *Id.*

C

**[3]** Here, there was no concealment of information at all. There was no material favorable to Bond that the government failed to produce. Nor did the government selectively disclose items to mislead the defense. Instead, it provided Bond with the information needed to acquire all trial testimony, and provided him with the essential factual data to determine whether the witness' testimony might be helpful. *See Dupuy,* 760 F.2d at 1502 (noting that it is enough if the defendant is "on notice of the essential facts which would enable him to call the witness"). We decline to extend *Benn* beyond cases in which the government has affirmatively misled the defendant by a selective disclosure of information.[5]

**[4]** Here, Bond essentially argues that Johnson's testimony would have been favorable to him and that the government "suppressed" such evidence in violation of *Brady* by failing

---

[5]Nor is Bond aided by our decision in *Paradis v. Arave*, 130 F.3d 385 (9th Cir. 1997). In *Paradis*, the government failed to turn over notes indicating that a prosecution expert had originally stated that the victim did not die in the creek where her body was found, even though that same expert later testified to the contrary. Again, the government had in its possession specific exculpatory evidence, but did not disclose it. *Id.* at 392. Instead, it presented evidence that was inconsistent with the exculpatory evidence, leaving the defendant no reason to believe that exculpatory evidence could be obtained. *See id.* at 395. In contrast, the government turned over to Bond the existence of the trial transcript, as well as notes from interviews of and other meetings with Johnson.

to call Johnson as a witness after indicating that it would. However, it is elementary that litigants are not *required* to call every witness identified on their witness lists. The witness list simply provides notice to the court and to opposing counsel of the witnesses who *may* be presented at trial. *See generally United States v. Schwartz*, 857 F.2d 655, 659 (9th Cir. 1988). Whether a litigant actually calls all, or any, of the witnesses on its witness list is purely a matter of trial strategy. *Brady* does not, as a general matter, supplant the prosecutor's ability to make strategic choices during litigation. *Cf. Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). Rather, as this court stated in *Morris*, "[t]he animating purpose of *Brady* is to preserve the fairness of criminal trials . . . . The *Brady* rule is not meant to displace the adversary system . . . ." *Id.* (internal quotation marks omitted). Bond merely could have subpoenaed Johnson on his own had he thought that the witness had anything exculpatory to say.

AFFIRMED.