**UNITED STATES of America,**

v.

**Darryl Lamont FRANKLIN.**

**Criminal No. 99–238–01.
Civ. No. 01–6530.**

United States District Court,
E.D. Pennsylvania.

April 26, 2002.

---

Glennis L. Clark, Allentown, PA, Mark S. Refowich, Easton, PA, for defendant.

Darryl Lamont Franklin, Lewisburg, PA, pro se.

Robert E. Goldman, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. Introduction

The Defendant in this case is seeking habeas corpus relief pursuant to 28 U.S.C.

§ 2255. On September 2, 1999, Defendant Darryl Lamont Franklin was convicted by a jury of Conspiracy to Commit Hobbs Act Robbery, Interference with Commerce by Robbery in violation of 18 U.S.C. § 1951(a), Brandishing a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c), and Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g). We held a sentencing hearing on February 11, 2000, and on February 14, 2000 we sentenced Defendant to 205 months incarceration. Defendant subsequently appealed and his sentence and conviction were upheld by the Third Circuit Court of Appeals on November 15, 2000. *United States v. Franklin*, 248 F.3d 1131 (TABLE) (3d Cir. Nov.15, 2000).

While we will not repeat the entire factual background of this case which was set forth in detail in *United States v. Franklin*, 64 F.Supp.2d 435 (E.D.Pa.1999) and *United States v. Franklin*, 2000 WL 217527 (E.D.Pa., Feb.14, 2000), this case is remarkable for both the overwhelming evidence supporting Defendants guilt and for the ferocity and extreme violence with which Defendant committed his crimes. On April 14, 1999 Defendant and another man robbed at gunpoint Talisman's Jewelry Store in Reading, Berks County, Pennsylvania. When Defendant Franklin entered the store he struck Daniel Cafoncelli, the son of store-owner Louis Cafoncelli, in the head with a 9 mm hand gun. Defendant then handcuffed Daniel Cafoncelli behind his back and threw him down a flight of stairs into the basement. When Louis Cafoncelli, who was initially outside the store, entered, Defendant pointed the gun at his head and a scuffle ensued. Louis Cafoncelli managed to draw his own gun (which he was licensed to carry as a jewelry store owner) and shoot Defendant. However, in the scuffle, Defendant got hold of Louis Cafoncelli's gun and fled the store. Just as he was about to leave, Defendant turned and pointed the gun at Louis Cafoncelli in an attempt to shoot him, but his plans were foiled when Cafoncelli got hold of another gun and returned fire, causing Defendant to flee the store.

Cash, jewelry, diamond rings, a revolver and a rifle were all taken during the robbery. Several minutes after the robbery, Defendant was found lying on the floor of St. Joseph's Medical Center. Some discarded jewelry was found outside the hospital and turned over to hospital security, the police were summoned, and Defendant Franklin was subsequently arrested.

Although Defendant testified in his own defense at trial, the Government introduced a massive amount of evidence including numerous eyewitnesses, law enforcement officials, and DNA samples taken from Defendant's clothing (Defendant refused to submit to a DNA test despite a court order) which tied him to the scene of the robbery. The jury rejected Defendant's story and he was convicted on all counts.

Defendant filed a *pro se* Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody and a Memorandum in support thereof on December 17, 2001. By Order of January 10, 2002 we noted that Defendant's *pro se* motion did not use the current, standard form and ordered that the Clerk of Court furnish Defendant with the appropriate forms. On January 28, 2002, Defendant filed another motion on an incorrect form. By Order of January 31, 2002, we again ordered Defendant to file his motion in appropriate form. On March 11, 2002, Defendant finally filed his habeas corpus motion on the appropriate form as mandated by Local Civil Rule 9.3.

Defendant raises numerous issues through his numerous habeas corpus motions. Though not all of these claims are raised in the March 11, 2002 motion, we

will, in the interests of justice, consider all of his claims. Defendant claims that: (1) the Court lacked jurisdiction to "try or sentence petitioner for conduct other than those prescribed by statute;" (2) the evidence was insufficient to support a finding of a nexus to interstate commerce; (3) his first attorney, Mark S. Refowich, Esq. rendered ineffective assistance of counsel in his pretrial representation; (4) trial counsel Glennis Clark, Esq. rendered ineffective assistance of counsel; and (5) his Sixth Amendment right to counsel was violated because trial counsel was burdened by a conflict of interest. Though Defendant raises numerous allegations of error, none of them have any merit. Consequently, his § 2255 motion must be denied.

## II. Discussion

For the sake of simplicity, we will divide our discussion of Defendant's claims into those that are based on ineffective assistance of counsel and those that are not.

### A. Ineffective Assistance of Counsel Claims

#### 1. Standard

■ The right to assistance of counsel is guaranteed by the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the Supreme Court; it cannot be denied to a defendant absent intentional and actual waiver. *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Supreme Court has set out a two-prong test to establish a claim of ineffectiveness of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must show both that: (1) his counsel's conduct was deficient and "fell outside the wide range of professionally competent assistance" and (2) the defendant was prejudiced as a result of that deficient conduct. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052;

*United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

To satisfy the first prong, deficiency, a defendant must show that his lawyer's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *See Id.* at 690, 104 S.Ct. 2052; *Diggs v. Owens*, 833 F.2d 439, 444–445 (3d Cir. 1987), *cert. denied*, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential").

If the first prong is proven, a defendant must also prove the second prong, prejudice. To show prejudice, a defendant must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal*, 10 F.3d at 104 *citing Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

## 2. Defendant's First Attorney

■ We initially appointed Mark S. Refowich, Esq. as CJA counsel to represent Defendant. On June 29, 1999, we received a *pro se* Motion for Change of Counsel and we held a hearing on this issue on July 9, 1999. Attorney Refowich is a seasoned criminal defense lawyer with more than 30 years of experience. As we have already noted in our Memorandum and Order of February 14, 2000, Mr. Refowich's performance appeared to be proper at all times. *United States v. Franklin,* 2000 WL 217527 at *5. However, based upon Defendant's unsupported allegation that Mr. Refowich had "shown both a deficiency in performance that has resulted in prejudice," we appointed new CJA counsel Glennis Clark, Esq. to represent Defendant.

Defendant's complaint at the time, which he reasserts now on habeas review, is that Mr. Refowich filed an *in limine* motion to preclude the Government from using Defendant's prior convictions for impeachment purposes pursuant to Fed.R.Evid. 609. In this motion, Mr. Refowich wrote:

> 5. The Defendant is planning to take the stand and offer testimony that at the time of the robbery he was walking on the street in front of the store and he saw a man with a black suit run from the store chased by an elderly man. That elderly man had a gun and fired at the fleeing man. The Defendant claims that he was hit by the bullets and that is all he remembers.

According to Defendant, including this paragraph in an *in limine* motion amounted to ineffective assistance of counsel, because the disclosure of Defendant's planned testimony was unnecessary, violated his Fifth Amendment right against self incrimination, and prejudiced Defendant by putting the Government on notice regarding his defense.[1] We disagree.

Defendant has satisfied neither the deficiency, nor the prejudice prong of the *Strickland* test. In evaluating the reasonableness of counsel's performance, the American Bar Association Standards serve as a helpful guideline. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *See also Government of the Virgin Islands v. Weatherwax ("Weatherwax I"),* 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II"),* 77 F.3d 1425, 1435 (3d Cir.1996). One of the most useful standards in this context is the ABA Standards for Criminal Justice § 4–5.2 (3d ed.1993), "Control and Direction of the Case," which dictates what decisions ultimately are to be made by a defendant, and which are left to a defendant's attorney. Specifically, strategic and tactical decisions such as which witnesses to call, whether to conduct cross-examination, and what trial motions to make are within the province of the attorney. ABA Standard § 4–5.2(b). The Commentary thereto states that when the attorney in question makes such strategic or tactical decisions, "[o]nly when [his or her] behavior revealed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel." *Weatherwax I,* 20 F.3d at 579, *citing* Commentary at 4.67–68.

We find that counsel's performance in disclosing Defendant's purported alibi in the *in limine* motion was an imminently reasonable strategic decision. The disclosure served to highlight for the Court the importance of Defendant's proposed testimony, thus emphasizing the importance of precluding the Government from using

---

**1.** Defendant raised this issue on direct appeal, but the Third Circuit declined to review the ineffective assistance of counsel claims, stating its preference to review such claims on habeas review. As such, this claim is properly before the Court.

damaging impeachment material. We cannot say that such a decision fell below the wide range of professionally reasonable representation.

Furthermore, even if counsel's performance were deficient, Defendant has completely failed to satisfy the prejudice prong of *Strickland.* Despite this disclosure, Defendant exercised his rights and testified in his own defense. There was no reference to this motion at trial, and thus any failures by counsel had absolutely no effect on the trial. Also, in light of the overwhelming amount of evidence against Defendant, there can be no doubt that any impact of this motion does not call into question the reliability of the guilty verdict.

Defendant has failed to satisfy either prong of the *Strickland* test for ineffective assistance of counsel. Accordingly, his claim for relief based on Mr. Refowich's filing of the *in limine* motion must be denied.

### 3. Defendant's Trial Attorney

#### a. Conflict of Interest

■ Defendant claims that trial counsel, Glennis L. Clark, Esq., was burdened by an actual conflict of interest in that simultaneous to his representation in this case, he was a candidate for the elected position of District Attorney for Lehigh County, Pennsylvania.[2] Defendant argues that this candidacy for office, in and of itself, is an actual conflict of interest which requires reversal of his conviction.[3]

■ The Sixth Amendment right to counsel includes a right to conflict-free counsel. *Hess v. Mazurkiewicz,* 135 F.3d 905, 910 (3d Cir.1998). "This requirement is an essential foundation of our adversarial system of justice, providing the minimum necessary to ensure that criminal defendants receive representation that 'puts the government to its proofs in an adversarial manner.'" *Id.,* quoting *United States v. Moscony,* 927 F.2d 742, 748 (3d Cir.1991). Counsel is ineffective if he " 'actively represented conflicting interests' and an actual conflict of interest adversely affected the lawyer's performance." *Id.,* quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In such cases, prejudice will be presumed and a defendant need only show that the actual conflict adversely affected counsel's performance, not that this adverse performance casts doubt on the reliability of the verdict. *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708.

Defendant supplies no support or authority for the proposition that a defense attorney's candidacy for a prosecution position creates an actual conflict of interest, and he certainly supplies no support for the extension of this proposition to include a situation, such as the one *sub judice,* where a defense attorney in federal court is seeking a local district attorney position in a different county from where the crime occurred.[4] This is not the least bit surprising as no such support exists.

**2.** All of the offenses involved in this case occurred in Reading, Berks County, Pennsylvania. The case was prosecuted by the United States Attorney's Office for the Eastern District of Pennsylvania. The Federal Bureau of Investigation, the Reading Police Department, and the Pennsylvania State Police investigated the case. Trial was held in the United States District Court for the Eastern District of Pennsylvania. There is no indication that anyone in the Lehigh County District Attorney's Office, police officers from Lehigh County, or anyone in the Lehigh County court

system were involved in the investigation, prosecution, or adjudication of this case.

**3.** In *Wood v. Georgia,* 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), the Supreme Court stated that, when given notice, the trial court is obligated to conduct an inquiry, regardless of the nature of the conflict. We were unaware of this potential conflict prior to Defendant's § 2255 motion.

**4.** Defendant has submitted a copy of a newspaper article about the race for district attor-

Though a question of first impression in this circuit, other district and appellate courts have addressed the question of whether a defense attorney seeking employment or elected office in a prosecutor's office creates an actual conflict of interest, and all have held that no actual conflict exists in such situations. For example, in *United States v. Horton*, 845 F.2d 1414, 1418 (7th Cir.1988), the Seventh Circuit held that there was no actual conflict where defense counsel was seeking appointment as United States Attorney at the time of trial proceedings. In addition, the *Horton* Court noted that though it may be conceivable that an unprincipled defense attorney in line for a job as a prosecutor might take action contrary to his client's best interests, "that is too fanciful upon which to base a per se rule of conflict." *Id.*, 845 F.2d at 1420.

Similarly, in *Moreland v. Scott*, 175 F.3d 347, 348–349 (5th Cir.1999), the Fifth Circuit held that there was no actual conflict under *Cuyler* where defense counsel in a state capital murder trial knew that he would be running for district attorney in the next election. Instead of being entitled to a presumption of prejudice, the petitioner had to show that counsel's performance fell below the objective standard of reasonableness and prejudiced his case under *Strickland*. *See also, Garcia v. Bunnell*, 33 F.3d 1193 (9th Cir.1994), *cert. denied*, 514 U.S. 1024, 115 S.Ct. 1374, 131 L.Ed.2d 229 (1995) (holding that, irrespective of waiver, defense attorney who had accepted a position with the prosecution to commence immediately after trial labored under a potential and not an actual conflict of interest); *United States v. Unruh*, 855 F.2d 1363, 1379 (9th Cir.1987) (finding no ineffective assistance of counsel where counsel failed to inform defendant of application for employment with the United States Attorney until just before trial).[5]

The Fifth Circuit has also held that where a defense attorney on a rape case also serves part-time as an assistant city attorney assigned to traffic court as a prosecutor, there is no actual conflict of interest requiring reversal of the conviction. *Mitchell v. Maggio*, 679 F.2d 77 (5th Cir.1982), *cert. denied*, 459 U.S. 912, 103 S.Ct. 222, 74 L.Ed.2d 176 (1982). In *Paradis v. Arave*, 130 F.3d 385, 390 (9th Cir. 1997), the Ninth Circuit upheld the district court's determination that where city park police played no role in the investigation of the case, a defense attorney who was also employed as a city park police officer did not actively represent conflicting interests and was thus not burdened by an actual

ney. According to Defendant, this shows that counsel had a pro-prosecution bias because he touted his conviction rates as a prosecutor. While we find that touting a conviction rate accumulated through a former career as an assistant district attorney does not reveal any bias for the prosecution, such a finding is irrelevant. The statements with which Defendant finds fault were not made by Mr. Clark but by his (ultimately successful) opponent.

5. *See also, Spinks v. McBride*, 858 F.Supp. 865 (N.D.Ind.1994) (finding no actual conflict where counsel was seeking employment as a deputy prosecutor); *Costanzo v. United States*, 758 F.Supp. 869 (S.D.N.Y.1990) (finding only a potential conflict where defense counsel applied for and accepted a job at United States Attorney's Office during the course of representation); *Carpenter v. United States*, 894 F.Supp. 95 (E.D.N.Y.1995), *aff'd in part, rev'd on other grounds in part*, 101 F.3d 686 (TABLE, TEXT IN WESTLAW) (2d Cir. June 10, 1996) (holding that there was a potential conflict, but not one so severe as to require recusal, where defense counsel had an application pending with the United States Attorney's Office); *Adanandus v. Johnson*, 947 F.Supp. 1021, 1055–1056 (W.D.Tex.1996), *aff'd*, 114 F.3d 1181 (TABLE) (5th Cir. Aug.7, 1997) (finding potential but not actual conflict of interest where counsel was a candidate for appointment as United States Attorney).

conflict of interest. Similarly, the Lehigh County District Attorney's Office played no role in the investigation or prosecution of this case and thus trial counsel did not actively represent conflicting interests.

■ In light of this jurisprudence and the record in this case, we find that trial counsel's candidacy for the position of Lehigh County District Attorney created, at most, a potential conflict interest. Defendant is thus not entitled to the presumption of prejudice under *Cuyler*, and instead must satisfy both prongs of the *Strickland* test in order to succeed on his numerous ineffective assistance of counsel claims.[6] As the record is totally devoid of any indication indicating that counsel's performance was influenced by his candidacy and Defendant has submitted nothing other than unsupported assertions to the contrary, this claim must be denied without a hearing. The burden of proof is upon the defendant in habeas corpus proceedings. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir.1980); *United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 174 (3d Cir.1976), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing in habeas corpus matters. *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir.1987); *Moorhead v. United States*, 456 F.2d 992, 996 (3d Cir.1972).

### b. Failure to Investigate and Prepare Adequately

■ Defendant claims that counsel was ineffective for failure to adequately review discovery material and interview defense witnesses. According to Defendant, this failure prevented counsel from impeaching the credibility of the Government's witnesses. We find this claim to be meritless on its face. Defense counsel was amply prepared at trial and consistently used discovery material to the defense's advantage in attempting to cast doubt on the credibility of Government witnesses. Furthermore, counsel's sworn affidavit demonstrates conclusively that he spent a great deal of time reviewing the vast amount of evidence in this case and that he attempted to interview numerous witnesses who declined to meet with defense counsel. Accordingly, this claim must be denied.

### c. Failure to Call Witnesses

■ Defendant claims that trial counsel was ineffective because he did not subpoena certain witnesses to testify, despite Defendant's request that he do so. The decision regarding which witnesses to call is an inherently strategic decision which is left to the control of defense counsel. ABA Standards for Criminal Justice § 4–5.2. Thus we will find counsel's decisions regarding which witnesses to call to be deficient only if they demonstrate a lack of preparation, ineptitude, unfamiliarity with basic legal principles or were made without any communication with the defendant.[7] *Weatherwax I, supra*, 20 F.3d at

---

6. We emphatically do not mean to endorse a rule that a candidacy or application for a prosecutorial position can never create an actual conflict of interest. For example, in *Horton*, the Seventh Circuit noted that actual conflict may exist where counsel admits that he feels pressure based on the situation. *Id.* at 1414. However, there is absolutely no indication that Mr. Clark's candidacy had any impact on his representation or that he felt any pressure. In fact, Mr. Clark has submit-

ted a sworn affidavit in which he states that his candidacy had absolutely no impact on his representation in this or any case and that he continued to vigorously represent Defendant and all his clients during the course of his unsuccessful candidacy.

7. Both the Affidavit of Mr. Clark and Defendant's own Memorandum of Law indicate that counsel discussed these strategic decisions with his client.

579.

### (1) Omar Belk and the 911 Tape

Defendant claims that a 911 tape of a recorded call by one Omar Belk would have impeached the testimony of Daniel Cafoncelli in that the tape would show that Defendant was mistakenly shot outside the store.[8] Defendant claims that the tape contains a statement by Mr. Belk that "he had seen an elderly White Man outside the jewelry store with a gun." According to Defendant, counsel was ineffective for failing to call Mr. Belk to the stand and introduce the 911 tape.

Special Agent Thomas Neeson of the FBI is the assigned case agent in this case and has submitted a sworn affidavit in which he states that he has reviewed the 911 tape and that it contains no such statement about an "elderly White Man." Mr. Belk called the police and informed them that someone had robbed a jewelry store but that he "did not see it." He made no personal observation of any of the events. Mr. Belk also stated that others told him that someone had robbed the store with a shotgun and that the shotgun was now lying in the street.[9] Furthermore, the affidavit of Mr. Clark states that he made the decision not to place the 911 tape into evidence because it did not advance the defense theory and did not indicate that Defendant was shot outside the store.

Defendant has satisfied neither the deficiency nor the prejudice prong of *Strickland*. Counsel's decision was a sound one in that the 911 tape was of no benefit to the defense. There is no prejudice because the tape and the testimony of Mr. Belk would not have advanced any defense theory and would have been inadmissible as hearsay regardless. Accordingly, this claim must be denied.

### (2) Shelby Himmelberger

Defendant next claims that counsel was ineffective for failing to call Shelby Himmelberger to testify. According to Defendant, Ms. Himmelberger gave a statement to the police that she had seen "an elderly White Man outside the store loading a shotgun."

According to the affidavit of Special Agent Neeson, Ms. Himmelberger advised police that she heard a gunshot and then observed the robber come from the store. She then saw that he walked into the street and dropped a handgun into the intersection. She then saw, at the rear of the store, an elderly white male "come out from the rear of the store" with a shotgun. Thus, her testimony would only have established that Louis Cafoncelli exited the store *after* the shooting, thus contradicting Defendant's story.

Mr. Clark's affidavit indicates that he considered using Ms. Himmelberger as a witness, but that ultimately, her testimony would have proven too damaging.[10] We

---

**8.** Defendant has misstated the testimony and the facts. Louis Cafoncelli, not his son Daniel, shot Defendant and made the only identification at trial.

**9.** Trial witness Ray Breidegan testified that he recovered a handgun that was lying in the street and not a shotgun.

**10.** The affidavit reads:

"The evidence from Ms. Himmelberger would not have been helpful to Mr. Franklin nor would it have supported his contention that he was shot as he walked past the front of the store. Ms. Himmelberger did not actu-

ally witness the shooting and therefore her observations were made after the shooting and while Mr. Franklin was already in the middle of the street. Had I called her to testify regarding Mr. Cafoncelli being at the rear of his business attempting to load a weapon, I would have been confronted with her statement that she saw a man who fit the general description of Mr. Franklin in the middle of Green Street carrying a handgun and a satchel. She also said the man dropped the handgun in the street which was corroborated by Ray Breidgeam [sic]. Even if she was available to testify for the defense, it would not have been good strategy to call

find that counsel's decision that the benefits of this testimony were outweighed by the harm it could cause was a sound strategic judgment and is exactly the type of decision which illustrates the rationale behind leaving strategic decisions within counsel's control. Furthermore, any benefit to Defendant from this testimony would have been slight and would not, in any way, cast into doubt the reliability of the guilty verdict. Accordingly, this claim must be denied.

### (3) "Sandy"

■ Defendant next claims that an unidentified woman named Sandy saw the license plate number of a getaway car and gave this information to trial witness Ray Breidegan. According to Defendant, counsel should have investigated this because "there is a reasonable probability that 'Sandy' may have seen more . . ." and that his failure to do so amounts to ineffective assistance of counsel.

A claim of ineffective assistance of counsel for failure to investigate must, of course, satisfy both prongs of the *Strickland* test. For a failure to investigate to constitute ineffective assistance, a defendant must show what exculpatory evidence would have been uncovered by further investigation. *United States v. Askew*, 88 F.3d 1065, 1073 (D.C.Cir.), *cert. denied*, 519 U.S. 986, 117 S.Ct. 444, 136 L.Ed.2d 340 (1996), quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir.1987). Even if an attorney is deficient in the decision not to conduct pretrial investigation, a defendant must show a reasonable likelihood that, but for the deficiency, the result of the proceeding would have been different. *Lewis v. Mazurkiewicz*, 915 F.2d 106, 115 (3d Cir.1990). Thus, at the least, a defendant must show that the investigation would have "produced useful information not already known to trial counsel." *Id.* See also, *United States v. Porter*, 924 F.2d 395, 397 (1st Cir.1991) (holding that failure to interview witnesses could not constitute ineffective assistance without a showing that the investigation would have helped defendant); *United States v. Lewis*, 786 F.2d 1278, 1282 (5th Cir.1986) (holding that defendant did not show ineffective assistance of counsel where defendant failed to point out any evidence that would have been produced, let alone evidence that would undermine confidence in the outcome of the trial).

Defendant makes no showing of the evidence that could have been obtained through an interview or investigation of "Sandy." He merely makes the blanket assertions that Sandy *"may* have seen more" and *"could* have offered exculpatory evidence and conflicting testimony (concerning government witnesses)" (*emphasis* added). Since Defendant has not made any showing that an investigation or interview of Sandy *would* have produced any exculpatory evidence which could cast doubt on the guilty verdict, we find that his claim of ineffective assistance of counsel for failure to investigate, interview, or call her to the stand must fail.[11]

her to make one point for the defense and three points for the Government."

**11.** In his affidavit, Mr. Clark has stated that Defendant never asked him to locate "Sandy" and "had he done so, there was no basis for me to believe she had exculpatory evidence." Furthermore, Special Agent Neeson has stated in his affidavit that, over a year after Defendant's trial, he located "Sandy" who turns out to be one Sandy Burkhardt who testified at the trial of Defendant's coconspir-

ator William Jones. According to Special Agent Neeson, her testimony was consistent with other Government witnesses and was not exculpatory to Defendant. A copy of Ms. Burkhardt's "302" report has been attached to the Government's response, and it indicates that someone named Gina came in to the store where she works, told her about the robbery, and gave her the license plate number which she wrote down and handed to Ray Breidigan.

### (4) The Nurse

Defendant next claims that counsel was ineffective for failing to investigate and call to the stand his nurse at the Berks County Prison Hospital. According to Defendant, this nurse could have offered exculpatory evidence because she was present during interviews with the F.B.I. and police and could have disputed Government evidence which showed that Defendant twice refused to submit to a blood sample test despite a search warrant signed by Magistrate Judge Arnold C. Rapoport.

Since Defendant has put forth no specific exculpatory evidence which this nurse could have offered based on her presence during interviews with law enforcement officials, we cannot consider it in our evaluation of counsel's performance. With regard to the Government's attempts to obtain a blood sample from Defendant, Special Agent Neeson, in his affidavit, stated that he twice tried to obtain the blood samples from Defendant. During the first attempt, Defendant refused and stated that he wanted to speak to his (first) attorney, Mr. Refowich. Special Agent Neeson then spoke to Mr. Refowich who informed him that he would advise Defendant to submit to the test. Mr. Refowich then advised Defendant via letter to submit to the test, but Defendant still refused.

At trial, counsel was very careful to ensure that the jury did not hear prejudicial testimony about Defendant's communications and attempted communications with his lawyer. Defense counsel, the Government, and this Court took steps to ensure that the jury would not hold Defendant's desire to speak to his attorney against him. Calling the nurse to testify about Defendant's desire to speak with counsel prior to submitting to the test would have undermined these efforts, exposed the jury to Defendant's communications with his attorney, and unfairly prejudiced the defense. As such, counsel's decision not to call the nurse was a reasonable strategic decision with which we find no fault.

Nor can Defendant satisfy the prejudice part of the *Strickland* test for counsel's failure to call the nurse to the stand. We have no doubt that Special Agent Neeson's affidavit is accurate and that the nurse's testimony would not have contradicted trial testimony. However, even assuming that the nurse would, in fact, contradict this testimony, given the overwhelming amount of credible and reliable evidence proving Defendant's guilt, a failure to call this witness does not cast any doubt on the reliability of the guilty verdict.

Since Defendant has failed to satisfy either prong of the *Strickland* test, his claim that counsel was ineffective for failing to call the nurse to the stand lacks merit and must be denied.

### (5) Officers Robles and Folk

Finally, Defendant claims that counsel should have subpoenaed and called to the stand Officers Lisa Robles and Bill Folk of the Reading Police Department. According to Defendant, Officers Robles and Folk would have testified about the fabrication of testimony by trial witness Officer Mike Fizz.

First, it must be noted, that Defendant has offered nothing other than unfounded, blanket assertions of fabrication in support of this claim. As stated above, bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing in habeas corpus matters. *Mayberry*, 821 F.2d at 185.

In addition, Officer Folk has submitted an affidavit in which he states that he has reviewed the testimony of Officer Fizz along with the police reports of Officers Fizz and Robles and that to the best of his knowledge and belief said testimony was

true and correct. Furthermore, Mr. Clark has stated in his affidavit that while his cross-examination of Officer Fizz showed some inconsistencies in the testimony, he is not aware of any evidence which would support the allegation that Officer Fizz fabricated his testimony.

In light of the affidavits of Officer Folk and attorney Clark, it is clear that Defendant's claim of fabricated testimony lacks merit. We cannot say that counsel's performance was deficient when he had no reason to suspect that the testimony was fabricated. Furthermore, Officer Folk has made it clear that neither he nor Officer Robles would have testified that Officer Fizz fabricated his testimony. Accordingly, this claim must be denied.

### d. Closing Arguments

Defendant next claims that he was denied the effective assistance of counsel where trial counsel conceded the interstate commerce element on closing arguments. This claim fails to satisfy either part of the *Strickland* test. First, despite Defendant's assertion that this concession deprived him of his only defense, the defense theory of the case was that Defendant did not commit the robbery. We find that conceding the interstate commerce element was a reasonable trial strategy in that the evidence strongly supported a finding of an effect on interstate commerce and trial counsel avoided appearing like the defense was contesting obvious proof.[12] Defendant has not satisfied the prejudice prong because even if counsel had vigorously challenged the interstate commerce

element on closing, there was abundant evidence to satisfy the required nexus to interstate commerce. Accordingly, this claim lacks merit and must be denied.

### e. Prior Conviction

Defendant's final complaint with trial counsel is that counsel failed to object to impeachment by prior conviction. Defendant's first attorney, Mr. Refowich, filed an unsuccessful *in limine* motion to prevent this impeachment.[13] Furthermore, this issue was preserved and unsuccessfully raised on appeal. Issues resolved in a prior appeal cannot be reviewed again by way of a § 2255 motion. *United States v. DeRewal,* 10 F.3d 100, 105 n. 4 (3d Cir.1993), quoting *Barton v. United States,* 791 F.2d 265, 267 (2d Cir.1986); *Konigsberg v. United States,* 418 F.2d 1270, 1273 (3d Cir.1969), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63. Though Defendant reasserts his complaint in the guise of an ineffective assistance of counsel claim, his claim that his prior conviction was not proper impeachment material is just as meritless now as it was before trial, during trial and on direct appeal. Accordingly, even if trial counsel had raised a second objection, it would have been denied. *See Keller v. Larkins,* 251 F.3d 408, 419 (3d Cir.2001) (holding that where expert testimony would have been admitted even over an objection, there could be no prejudice resulting from failure to object). As such, Defendant's claim lacks merit and must be denied.

---

**12.** It must be noted that throughout trial, counsel attempted to refute the link between this robbery and interstate commerce. According to his affidavit, Mr. Clark objected to the admission of this evidence, and "Once the objection was overruled, counsel's strategy was to downplay the significance of the connection between interstate commerce and

simply remind the jury that there was no physical evidence to prove the nexus."

**13.** It should be noted that Defendant is simultaneously arguing that Mr. Refowich was ineffective for attempting to prevent this damaging impeachment material (*See, supra* Part II–A–2) and that Mr. Clark was ineffective for failing to do the same.

### f. Conclusion

Defendant has made numerous allegations of ineffective assistance against Mr. Clark. They are all completely lacking in merit. While we think that better practice would have been to disclose his candidacy for District Attorney and ask for a hearing on the issue, we cannot fault counsel for failing to see the potential conflict of interest, given the absence of any link between this case and the Lehigh County District Attorney's Office. Furthermore, it must be noted that counsel performed admirably and vigorously represented the interests of his client throughout the trial and direct appeal, despite the fact that Defendant was often uncooperative and was faced with a massive amount of reliable and corroborated evidence.

### B. Non–Ineffective Assistance of Counsel Claims

#### 1. The Indictment

Defendant claims that his conviction on Count II, the substantive Hobbs Act Robbery, must be overturned because the indictment does not allege that he acted intentionally or knowingly. Though there

is no intent element in the text of 18 U.S.C. § 1951, Defendant argues that acting knowingly or willingly is an implied necessary element which must be included in the indictment.

■ Defendant has never previously raised this issue, nor has he ever challenged any part of the indictment prior to this collateral attack on his conviction. When a federal prisoner has not presented his claims in the trial and appellate courts, he must clear a significantly higher hurdle than on direct appeal and show cause for his procedural default and actual prejudice resulting therefrom. *United States v. Frady*, 456 U.S. 152, 166–168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Accordingly, this claim is procedurally defaulted, despite Defendant's assertions to the contrary.

In *United States v. Spinner*, 180 F.3d 514 (3d Cir.1999), the Third Circuit held that the failure to include the interstate commerce element in a Hobbs Act indictment was a fundamental, jurisdictional defect which could be raised at any time. However, unlike *Spinner*, the indictment in this case [14] does not leave out any of the statutory language.[15] In *United States v.*

**14.** Count Two of the indictment, filed April 29, 1999, states:

> **THE GRAND JURY FURTHER CHARGES THAT:**
> On or about April 14, 1999, in Reading, Berks County, in the Eastern District of Pennsylvania, defendant
> **DARRYL LAMONT FRANKLIN**
> did unlawfully obstruct, delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in that the defendant did unlawfully take and obtain, and aid and abet the taking and obtaining of, property, that is approximately $30,000 in United States currency and jewelry, belonging to Talisman's Jewelry Store located at 1167 Green Street, Reading, Pennsylvania, from

> the care, custody, control, management, and possession of Talisman's Jewelry Store employees, in the presence of the employees, against their will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to their person.
> In violation of Title 18, United States Code, Section 1951 and 2.

**15.** 18 U.S.C. § 1951 reads in part:

> **§ 1951. Interference with commerce by threats or violence**
> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this

*Stewart,* 151 F.Supp.2d 572, 577 (E.D.Pa. 2001), the District Court, facing a situation similar to the case *sub judice,* held that where the defendant challenged the sufficiency of the indictment for the first time on collateral attack, his claim was procedurally defaulted.[16] Furthermore, the Court rejected the defendant's reliance on *Spinner* because the superseding indictment "did not omit any statutory element of the crimes charged." *Id* at 584.

Defendant has not made any showing of cause which could excuse his procedural default. Cause for failing to raise a claim exists if the claim had "no reasonable basis in existing law." *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), quoted in *Stewart,* 151 F.Supp.2d at 575. Defendant bases his claim that a Hobbs Act indictment must include an intent element on two Ninth Circuit cases, *United States v. Soriano,* 880 F.2d 192 (9th Cir.1989) and *United States v. Du Bo,* 186 F.3d 1177 (9th Cir.1999). Defendant was convicted on September 2, 1999, more than ten years after the *Soriano* decision and three weeks after the *Du Bo* decision. There was a reasonable basis in existing law for making

this claim prior to trial and certainly prior the Defendant's direct appeal, notice of which was filed on February 22, 2000. Furthermore, the Third Circuit held in 1958 that intent was an implied necessary element of Hobbs Act Robbery that had to be included in the jury charge. *United States v. Nedley,* 255 F.2d 350 (3d Cir. 1958). *See also Government of the Virgin Islands v. Carmona,* 422 F.2d 95 (3d Cir. 1970) (holding that intent was an implied necessary element of robbery under the Virgin Islands Code that had to be included in the jury charge). Clearly, the *Nedley* decision at least provided a reasonable basis for a timely challenge to the indictment, even if that decision only dealt with jury instructions.

 Nor can Defendant establish actual innocence, the only way which his lack of cause for the procedural default can be excused. *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), cited in *Stewart,* 151 F.Supp.2d at 577. "Simply stated, 'actual innocence' . . . means that the person did not commit the crime." *Stewart,* 151 F.Supp.2d at 577, quoting *United States v. Garth,* 188

---

section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section-

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining . . .

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any pont in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between

points within the same State through any place outside each State; and all other commerce over which the United States has jurisdiction.

**16.** In *Stewart,* the defendant was convicted of numerous counts of RICO, mail fraud, and wire fraud. Subsequent to his conviction becoming final, the Supreme Court ruled in *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), that licenses issued by states are not property within the meaning of the mail fraud statutes, though part of the superceding indictment alleged a mail fraud scheme to illegally obtain state licenses. Also, subsequent to his conviction, the Supreme Court held in *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), that "materiality of falsehood is an element of the federal mail fraud . . . statutes," despite the fact that materiality is not a statutory element and was not included in the indictment.

F.3d 99, 107 (3d Cir.1999). This case was remarkable for the utterly overwhelming amount of evidence proving beyond any doubt the Defendant committed the crime, the most striking of which was a reliable eyewitness identification by the victim, DNA evidence which tied Defendant to the scene of the crime, and stolen property from the jewelry store mixed in with the Defendant's key chain found outside the hospital where Defendant sought treatment just minutes after he was shot by the victim. Furthermore, despite the fact that there was no mention of the intent element in Count II of the indictment, we instructed the jury that they had to find that Defendant acted intentionally. Trial Tr, 9/2/99 at 129. Accordingly, this claim is barred by procedural default.

■ In addition to being·procedurally defaulted, this claim lacks merit. In *United States v. Hodge*, 211 F.3d 74 (3d Cir. 2000), the Third Circuit held that failure to include the intent element in the defendant's indictment for robbery under the Virgin Islands Code was not reversible error. This holding is especially relevant in light of the of the Third Circuit's holding in *Carmona, supra* that a charge of robbery under the Virgin Islands Code must include an instruction on the intent element. Furthermore, since *Carmona* was simply an extension of the *Nedley* rule

requiring an intent instruction for Hobbs Act Robbery, we see no logical reason why we should not reach the very same conclusion as the *Hodge* Court. Accordingly, we find that the rule requiring an intent instruction on a Hobbs Act Robbery charge applies only to jury instructions and not to the indictment. To the extent that Ninth Circuit has held otherwise in *Du Bo, supra*, we respectfully believe that the Third Circuit would hold differently.[17]

■ Count Two of the indictment is sufficient on its face. The Third Circuit considers a two part test in evaluating the sufficiency of an indictment: (1) whether the indictment contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hodge*, 211 F.3d at 76, quoting *Government of the Virgin Islands v. Moolenaar*, 133 F.3d 246, 248 (3d Cir. 1998), quoting *Russell v. United States*, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (internal quotations omitted). In this case, the indictment was more than sufficient to apprise Defendant of the robbery charged and enable him to avoid subsequent prosecution on double jeopardy grounds, even though there is no intent element stated in the indictment.[18]

---

**17.** Even if *Du Bo* were controlling precedent in this circuit, footnote 3 to the opinion states that "Our holding is limited to cases where a defendant's challenge is timely." *Id.*, 186 F.3d at 1180, n. 3. Since Defendant's challenge is not timely, this claim would fail in both the Third and Ninth Circuits.

**18.** In addition, the language of Count II of the indictment states that Defendant used "actual and threatened force" and "did actually obtain" the property. We think that the fair inference of this is that the Grand Jury did indeed find that Defendant acted intentionally. "[W]hen a challenge is urged for the first time on appeal," the Third Circuit, "will construe the indictment liberally in favor of valid-

ity." *United States v. Cefaratti*, 221 F.3d 502, 507 (3d Cir.2000). This challenge is raised for the first time well after appeal and accordingly we find that the liberal construction rule applies with equal (if not greater) force to this challenge to the indictment, first raised on collateral attack.

Furthermore, while we hesitate to use language from another count of the indictment in evaluating Count Two, it should be noted that Count I (Conspiracy to Commit Hobbs Act Robbery), charged the same robbery as an overt act in furtherance of the conspiracy. In describing this robbery/overt act, the Grand Jury charged that an unknown coconspirator scouted the location, that Defendant and an

■ Finally, in an attempt to get around his procedural default, Defendant claims that trial counsel was ineffective for failing to challenge the sufficiency of the indictment prior to trial. We find that this claim of ineffective assistance of counsel satisfies neither the deficiency nor the prejudice prong of *Strickland.* First, we think it would be a reasonable strategic decision on the part of counsel not to challenge the indictment because, even if successful, it is obvious that the Government would simply seek a superceding indictment based on the very same evidence, this time including an intent element. Second, and most importantly, even if counsel successfully moved to dismiss Count Two of the indictment, such a dismissal would have absolutely no effect or prejudice on Defendant's trial or sentencing. The conspiracy charge in Count I names the very same robbery as an overt act in furtherance of the conspiracy. Thus, the proof at trial would have been identical whether Defendant was charged with conspiracy and robbery or just conspiracy. Also, Counts One, Two, and Four were grouped pursuant to U.S.S.G. § 3d1.2(c) for purposes of sentencing and the offense level was determined by the highest level of the group. The offense level for Counts One and Two was the same and the highest of the group. Accordingly, even if Count Two was dismissed prior to or after trial, it would have

absolutely zero effect on Defendant's sentence.[19]

Defendant's challenge to the indictment is barred by procedural default and lacks merit. His claim that counsel was ineffective for failing to raise this issue previously is likewise lacking in merit. Accordingly, this claim must be denied.[20]

### 2. Interstate Commerce

■ Defendant also seeks relief on the ground that the evidence at trial was insufficient to satisfy the interstate commerce element of the Hobbs Act. Though Defendant contested the connection to interstate commerce under the Hobbs Act charges and the weapons charges at trial, he did not challenge the sufficiency of the evidence on his direct appeal. Accordingly, this claim is procedurally defaulted as per *Frady, supra.* Defendant has supplied no excuse or cause that led to this procedural default, nor has he even alleged any prejudice resulting therefrom. Furthermore, Defendant's challenge of the sufficiency of the evidence is based entirely on the trial record which was obviously available to him at the time of his direct appeal.

■ Furthermore, even if this claim were properly before the Court, it is utterly lacking in merit. There is abundant testimony to support a finding of an effect on interstate commerce. Evidence at trial

unknown coconspirator robbed the jewelry store at gunpoint, that Defendant struck a victim in the head with a 9 mm semi-automatic handgun, that Defendant handcuffed a victim and threw him down a flight of stairs, and that Defendant took approximately $30,000 in currency and jewelry from the store and exited the store with said currency and jewelry. Thus, it is clear that the Grand Jury was presented with evidence that indicated that Defendant acted intentionally.

**19.** Of course, the same would be true if we found Defendant's claim to be properly before this court and have merit. Even if we grant-

ed Defendant's motion to vacate the conviction for failure to include the intent element in the indictment, it would prove to be quite a hollow victory for Defendant who would serve the same amount of time regardless of a successful habeas motion.

**20.** Defendant has also claimed that his conviction on Count III, brandishing a firearm in furtherance of a crime of violence, must be vacated because it was predicated on the defective Count II. Since Defendant's challenge to Count II is denied, the challenge to Count III must likewise be denied.

proved that the store is involved in interstate commerce, the jewelry and guns that were taken during the robbery traveled in interstate commerce, and the firearm that Defendant brandished traveled in interstate commerce. *See, e.g.,* Trial Tr., 8/31/99 at 50 ("we get things from Louisiana, we get things from New York, we get things from Alabama"), *Id.* at 94 (" ... I buy the mountings from Louisiana"), *Id.* at 97, 112, 113,[21] 132,[22] 133.[23] *See also,* Trial Tr. 9/1/99 at 105.[24]

Finally, Defendant argues that his felon in possession conviction under 18 U.S.C. § 922(g)(1) must be vacated because the Government did not present any evidence that the weapons in question traveled in interstate commerce prior to the enactment of the § 922(g)(1). This claim, based entirely on the trial record, is procedurally defaulted.

 Even if this claim were properly before the Court, it lacks merit. At trial, the Government established that Defendant possessed two guns; one that he carried into the store and the victim's weapon that Defendant removed from the store after the struggle. The Government further established that both guns had been manufactured outside of the State of Pennsylvania. Numerous courts have established that under § 922(g), proof of a gun's manufacture outside of the state in which

it was possessed is sufficient to support the factual finding that the firearm was "in our affecting commerce." *See, e.g. United States v. Gourley,* 835 F.2d 249, 251 (10th Cir.1987); *United States v. Clawson,* 831 F.2d 909, 913 (9th Cir.1987); *United States v. Gregg,* 803 F.2d 568, 571 (10th Cir.1986). The argument that the Government must establish that the firearm had traveled in interstate commerce after enactment of the statute lacks merit and has been thoroughly rejected by the courts. *United States v. Agnes,* 453 F.Supp. 1256, 1259 ·(E.D.Pa.1978), *aff'd,* 601 F.2d 576 (TABLE) (3d Cir.1979) (holding that statutory requirement is met as long as the firearm has traveled in interstate commerce at any time before the defendant receives it), *cert. denied,* 444 U.S. 933, 100 S.Ct. 278, 62 L.Ed.2d 191 (1979); *United States v. Gillies,* 851 F.2d 492, 495–496 (1st Cir.1988) (stating that the Government must prove only that (1) the defendant engaged in the only act that the law forbids, possession and (2) that the defendant engaged in the act of possession after the enactment of the statute).

### III. Conclusion

As stated above, all of Defendant's claims are entirely without merit. Defen-

---

**21.** "Most of my stones are purchased from suppliers in probably Chicago, the National Diamond Syndicate, New York Borrow Corporation."

**22.** "Most of them [diamonds] are Australia and Russia right now, with Africa, I would say, probably ranking third."

**23.** Q: What percentage of you inventory that was in your store on April 14th would you say came from outside the State of Pennsylvania?
A: 75 percent, maybe more

**24.** Q: Are you the assigned FBI agent in this case?
A: Yes, I am the case agent in this case.

Q: Now, you're familiar with the handguns which are present before you, being the Glock, the Ruger and also the .38 caliber that we had testimony to-
A: Yes, I am.
Q: are you not? Can you tell us whether or not those guns are manufactured in the State of Pennsylvania?
A: Those guns are not manufactured in the State of Pennsylvania.
Q: There's testimony about an AK47 rifle. Is that manufactured in the State of Pennsylvania?
A: No.

dant's motion for relief under § 2255 is therefore denied.